UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

TREK BICYCLE CORPORATION,
    Plaintiff,

v.                                          Case No. 08-CV-198

LEMOND CYCLING, INC.

    Defendant.

---

## COMPLAINT

Plaintiff Trek Bicycle Corporation, by its attorneys Gass Weber Mullins LLC, by Ralph A. Weber and Christopher P. Dombrowicki, alleges as follows for its Complaint against Defendant LeMond Cycling, Inc:

### Parties

1.    Plaintiff Trek Bicycle Corporation ("Trek") is a Wisconsin corporation with its principal place of business located at 801 West Madison Street, Waterloo, Wisconsin, 53594.

2.    Defendant LeMond Cycling, Inc. ("LeMond Cycling") is a Minnesota corporation with its principal place of business located in Wayzata, Minnesota.

### Jurisdiction And Venue

3.    This court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 due to diversity of citizenship between Trek as plaintiff and LeMond Cycling as defendant, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this court pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, LeMond Cycling is subject to personal jurisdiction in this judicial district and Wisconsin law applies to this dispute.

**Factual Background**

5. Trek has built a reputation for excellent bicycles. Trek's trademarks have become synonymous with industry-leading quality and innovation, and the goodwill associated with its trademarks has substantial value to Trek's business. Based on the strength of its trademarks, Trek markets its products to a diverse group of consumers including amateur and professional bicycle racers, cycling enthusiasts, health and fitness enthusiasts, recreational cyclists and families.

6. Greg LeMond, a former world class cyclist and three-time winner of the Tour de France, formed LeMond Cycling for the purpose of developing and licensing the various trademarks associated with his name ("LeMond trademarks").

7. On June 29, 1995, Trek and LeMond Cycling entered a Sublicense Agreement whereby LeMond Cycling, as licensor, granted Trek an exclusive license to sell cycling products bearing the LeMond trademarks. A copy of the Sublicense Agreement is attached to this Complaint as Exhibit 1.

8. Greg LeMond elected to sublicense his brand to Trek after his other efforts to build and sell bicycles met with limited success.

9. Given the circumstances, Trek took on significant risk and expense in entering into the 1995 agreement. For example, since 1995 Trek has paid LeMond more than $5 million, and has invested millions more to design, manufacture and market

LeMond-branded bicycles. Accordingly, it expected LeMond to cooperate fully with Trek and its dealers so as to promote, not damage, the LeMond brand.

10. On August 10, 1999, Trek and LeMond Cycling entered a First Amendment to the Sublicense Agreement which, among other things, increased the minimum royalty Trek was required to pay LeMond Cycling for use of the trademarks to $350,000 per contract year, extended the term of the agreement to September 30, 2010, and granted Trek two five-year options to renew the agreement until 2020. A copy of the First Amendment to the Sublicense Agreement is attached to this Complaint as Exhibit 2.

11. Pursuant to paragraph 16.03 of the Sublicense Agreement, titled "Certain Conditions," LeMond Cycling is required to "cause [Greg LeMond] to render his services hereunder in a professional and conscientious manner." Pursuant to paragraph 2.02, Greg LeMond's services include "promotion" of the LeMond bicycles and bicycle frames.

12. Pursuant to paragraph 2.01 of the Sublicense Agreement, LeMond Cycling granted to Trek "the exclusive right and license (without the right to assign the same or grant sublicense thereunder), to use the Mark in the Territory during the Contract Period in connection with the manufacture, advertisement, promotion, sale and distribution of" LeMond bicycles and bicycle frames. The First Amendment to the Sublicense Agreement retained the language regarding Trek's exclusive right to sell and distribute LeMond Bicycles in the Territory in the Contract Period.

13. Contrary to the contract promises and Trek's reasonable expectations, Greg LeMond has repeatedly damaged his brand, and Trek's other business interests. Instead of helping to grow a valuable business, Greg LeMond has for years impaired, and now destroyed, 13 years' efforts by Trek and its dealers.

### Greg LeMond Wrongly Purchases, Resells or Distributes
### LeMond Bicycles In Competition with
### Trek's Authorized LeMond Dealers

14. Trek operates its business through an extensive network of Independent Bicycle Dealers ("IBD's"). In exchange for meeting numerous obligations to Trek pursuant to Dealer Agreements, Trek's IBD's have exclusive rights to sell to consumers Trek bicycles, including LeMond-branded bikes. This exclusive right to purchase and resell Trek bicycles, including LeMond-branded bicycles, is of course at the heart of the Trek – Dealer relationship. Accordingly, Trek and its Dealers take very seriously any improper efforts to undercut these Dealer rights through unauthorized sales or distribution of Trek bicycles, including LeMond-branded bicycles.

15. As a person experienced in the bicycle industry, and as a sophisticated businessman earning millions of dollars from his license of his LeMond brand to Trek, Greg LeMond is well aware of this Trek – Dealer relationship, its extreme importance to Trek and its IBDs, and how unauthorized sales of LeMond-branded bikes outside of the Dealer network would harm those dealers and cause harm to Trek – Dealer relationships.

16. Notwithstanding his limited rights under the Sublicense Agreement to a small number of bikes each year for personal use (ie., 15), since 1999 Greg LeMond has made numerous purchases of LeMond bicycles at employee pricing from Trek with a suggested retail value of over $2,500,000. Upon information and belief, Greg LeMond has resold, bartered for value or otherwise distributed many or most of these bikes, harming Trek and its dealers.

17. As one example, in early March 2008, a Trek Dealer sold two LeMond Zurich bicycles to two customers. These bicycles sell at retail for more than $2,800, each,

and thus are important sales. This Dealer ordered the bikes and expected to complete the sales when the bikes arrived. On or about March 15, 2008, one of the two customers who had ordered the LeMond Zurich bicycles returned and informed Trek's Dealer that he and the other customer were able to get LeMond-branded bicycles directly from Greg LeMond himself, at a price much lower than the retail price. The customer explained that since they were saving over 50% by buying from Greg LeMond instead of from the Dealer, they ordered La Victoires, a more expensive LeMond-branded bicycle ($5,279.99 suggested retail price), instead of the Zurich bicycles they had ordered from the Dealer. As his business was harmed by the loss of sales as a result of LeMond's unauthorized and unlawful conduct, the Dealer commented:

> "Why would we support a vendor that is deliberately using back-channels to sell products in our market? As an immediate resolution to this problem, the only fair and practical thing that I can see is to bill Mr. Lemond's account for the lost profit $$ that we have foregone as a result of his action. Furthermore, going forward, I would like an apology and his word that he will not sell around his dealers going forward."

18.     When Trek checked its records, it discovered that on or about March 13, 2008, less than two weeks after Trek had warned LeMond that his "employee pricing" purchases were so high as to constitute lost business opportunities for Trek and Trek's LeMond dealers, Greg LeMond indeed had purchased two La Victoire bicycles from Trek at employee pricing.  Upon information and belief, those were the bicycles sold to the Dealer customers described above.

19.     Just days ago, Greg LeMond attempted to purchase two more LaVictoire's at employee pricing.

20. Upon information and belief, Greg LeMond has resold, bartered for value or otherwise distributed many or most of the other bicycles that he purchased from Trek at employee pricing. Greg LeMond has used these improper purchases to act as an unauthorized dealer of LeMond-branded bicycles, wrongly competing with Dealers in breach of Trek's exclusive rights and knowingly and intentionally harming Dealers, Trek and Trek's relationship with its Dealers.

### Greg LeMond Harms Trek by
### Publicly Disparaging an Important Trek-Endorsed Athlete

21. As early as 2001, Greg LeMond began publicly disparaging Lance Armstrong. Greg LeMond's statements are quoted at length in a complaint that LeMond Cycling recently served upon Trek but has not, to date, filed.

22. During the 2004 Tour de France, Greg LeMond repeated and intensified his public disparagements. Greg LeMond made these statements during television interviews, in national and international newspapers, magazines, trade press and publications, and on the internet. LeMond has also made negative comments about other professional cyclists and athletes.

23. As a result of Greg LeMond's statements, Trek received numerous complaints from customers. For example, one customer wrote, "I was considering purchasing a LeMond bike but after hearing the comments he has been making about Lance Armstrong the only thing I would use it for is an anchor for my boat. Have fun selling bikes, what a great spokesperson."

24. Another customer's complaint cogently demonstrated both the value of brand identification and the damage done to the LeMond brand by Greg LeMond's statements:

> "Every year, for the last 4 years, I have purchased a LeMond bike for its quality and robustness. And of course, because it bears the name of an athlete who once had class and panache. Perhaps, in the big picture, I am insignificant, but please inform the CEO that he has just lost a once faithful customer. I can understand the relentless attacks on Armstrong from European sources. But make me understand what Mr. LeMond has to gain by joining the cacophony??? To further glorify his wins??? . . . .

25. Many emails raised the fact that Trek is associated with both LeMond and Armstrong:

- One customer commented, "[d]oesn't Trek sponsor both Lance AND LeMond bikes? What's going on there?"

- Another wrote, noting his "disgust," and remarked, "I was writing a letter to his [LeMond's] Cycle company, when I saw that you own them? How awkward must that be for you, the best thing ever to happen to the sport and Trek, attacked by the namesake of one of your brands?"

- Yet another remarked, sarcastically, "[i]t must be great comfort to the great people at Trek who sponsor Lance Armstrong (which builds and distributes LeMond bicycles) that they also represent a jerk in Greg LeMond."

26. Accordingly, Trek's president John Burke discussed multiple times with Greg LeMond Trek's concern over the effect of the statements on the value of the LeMond trademarks, Trek's business, and Trek's goodwill. John Burke reminded Greg LeMond that since Armstrong endorsed and used Trek products, and since Armstrong created interest in road bicycles of the type sold under the LeMond brand, Armstrong's accomplishments helped both the Trek and the LeMond brands. The value of any trademark is the positive link in the consumer's mind between the mark and the product,

7

which motivates the consumer to have dealings with the company. Accordingly, LeMond's disparaging comments tarnished LeMond's image, and/or Armstrong's image, and thus impaired the value of important Trek assets.

27. Apparently recognizing the damage he was doing, Greg LeMond made repeated commitments to refrain from making further disparaging statements and to honor the obligations under the Sublicense Agreement so as not to harm the value of his brand and Trek's business.

28. Greg LeMond's disparaging statements substantially damaged the value of the LeMond trademarks he agreed to license to Trek and damaged Trek's ability to market and sell its LeMond line of bicycles. In addition, Greg LeMond's disparaging statements likewise damaged the value of Trek's non-LeMond business interests, including but not limited to its endorsement agreement with Lance Armstrong, and thus impaired Trek's ability to market and sell its non-LeMond product lines to its diverse consumer base.

29. Accordingly, Trek informed LeMond Cycling in August 2004 that it was in breach of the Sublicense Agreement and that Trek was entitled to terminate because LeMond Cycling and/or Greg LeMond took action which "damage[d] or ha[d] an adverse impact" on the trademarks LeMond Cycling licensed to Trek, and also on Trek, Trek's business, and Trek's goodwill. Instead of providing Notice of Termination at that time, Trek asked LeMond to find another licensee for his brand.

30. After learning he could not find another company who would license his brand, in December 2004 Greg LeMond had LeMond Cycling serve and threaten to file a lawsuit making numerous disparaging statements harmful to Trek and its business interests. Greg LeMond did so in order to compel Trek to withdraw its Notice of Breach

8

and continue to do business with him and LeMond Cycling, notwithstanding Trek's right to terminate the Agreement. As it stated at the time in January 2005, given the damage litigation would cause to Trek and the LeMond brand, Trek was forced to withdraw the Notice of Breach and to continue doing business with LeMond and LeMond Cycling.

31. After a face-to-face meeting with Greg LeMond in April 2005, John Burke emailed Greg LeMond explaining, as he had in person, "Trek does not have any problem with you making general comments regarding the negative affects of doping on the sport and the positive steps being done to address it. Just do not publicly comment on specific athletes. Commenting on specific athletes is not good for you, Trek or the LeMond brand."

32. John Burke went on to explain in his email that, "we want to move the public perception back to Greg LeMond, first American to win the Tour, three-time Tour winner, overall great guy and someone who cares deeply about the cleanliness of the sport. Please let me know if you agree."

33. Greg LeMond emailed John Burke on April 12, 2005, stating, "I am ready to move on regarding the doping and LA."

34. Thereafter, Greg LeMond again assured Trek he understood the need to protect his brand, and reassured Trek he would not again make disparaging remarks about Lance Armstrong. In a December 15, 2005 email to Trek's President, John Burke, LeMond wrote:

> "I want to reassure you that I have no intentions of going out there and blasting off on LA. I want to move beyond this last period and start to enjoy riding the bike and the bike business."

9

35. Once again, Greg LeMond broke his promise, again and again, and disparaged Lance Armstrong and other professional athletes. Once again, customers were angered.

36. One customer made his point through humor:

> "I recently purchased a LeMond bike and am having an unusual problem. When I place it in the garage next to my Specialized and Trek bicycles it begins to whine and complain that the other bikes are cheaters and that it is the only true "American Champion." I was wondering, if maybe Greg himself would stop being a whining asshole, maybe this piece of shit bike would also stop. Please have him do it publicly so I can bring the bike in to watch it on TV. I suppose this is not covered under warranty."

37. Yet another complaint again showed the link between LeMond's statements and brand damage. The customer comment came in the following form:

> "Name: Former LeMond Fan
> Email: lemondsucks@yahoo.com
> Comments: Has Greg always been a sniveling, insecure jerk who needs to denigrate others accomplishments in order to boost his own self esteem? If Greg's bikes display the same quality as he displays as an individual, please keep them far away from me."

38. Another recent example of the damage occurred at a key time for Trek's promotion of the LeMond line in Europe. Last fall, Greg LeMond gave an interview to the most influential European road bicycle magazine, "Tour." In the October 2007 issue, in response to a question, "You haven't been in touch with Road Racing for a while," LeMond responded, "This is for my problems with Armstrong. I criticized his cooperation with Michael Ferrari and for that reason got into big trouble with Trek. If I had loudly said what I thought this would have been suicide for my business."

39. Trek's European Director promptly received a complaint from Trek's German subsidiary, forwarding the interview comments and stating, "Those quotes don't

help our image in Germany." Trek's European Director in turn forwarded the complaint to John Burke, noting,

> "So I bust my balls to get LeMond on the booth at Eurobike and into our GAS dealer programme and then up pops Greg in Tour Magazine (The most influential European/GAS road magazine) and slags off Trek right slap bang in the middle of pre-season when we are trying to get the bikes (the ones with his name on) into the dealers.
>
> The guy is legend and I have the utmost respect for what he achieved in the sport but from a commercial perspective he's an idiot and I don't see any way back for us in Europe."

40. In November 2007, John Burke met privately with Greg LeMond and advised him informally that Trek would not be extending its Agreement with LeMond beyond its 2010 initial term. LeMond asked for permission to look for other business partners, and Trek agreed, later providing certain business information at LeMond's request so as to assist LeMond with finding a new supplier.

41. Once again, on March 20, 2008, with the intent to compel Trek to continue to do business with him, or to pay him amounts not due, Greg LeMond had LeMond Cycling again serve and threaten to file a lawsuit with disparaging statements harmful to Trek and its business interests.

42. This threatened Complaint purports to be about Trek's alleged failure to use "best efforts" to promote the LeMond line, but in fact the document is filled with disparaging remarks about Lance Armstrong, other professional athletes and Trek that have nothing to do with purported "best efforts" issues. These allegations are included with the intent to cause Trek to fear their publication and thus pay sums not due and/or continue with the LeMond brand against its will. Indeed, in the transmittal letter to Trek

11

with the unfiled Complaint, Greg LeMond and LeMond Cycling's counsel notes that the Complaint is not "publicly-available at this time."

**FIRST CLAIM FOR RELIEF**
**Declaratory Relief—Trek Has Not Breached "Best Efforts" Clause**

43. All prior paragraphs are incorporated by reference.

44. Pursuant to paragraph 5.02 of the Sublicense Agreement, Trek is to use its "best efforts to exploit the Mark in respect of Licensed Products [bicycles and bicycle frames bearing the LeMond trademark], and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, consistent with the quality and reputation of Licensor [LeMond Cycling], and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND [Greg LeMond]."

45. Pursuant to paragraph 4 of the Sublicense Agreement, Trek must pay LeMond Cycling a minimum royalty each year.

46 Pursuant to paragraph 8.01 of the Sublicense Agreement, Trek must spend a "reasonable amount" on marketing, promotion and advertising of LeMond bicycles and frames consistent with its promotion of comparable lines of bicycles and frames, and agreed that a "reasonable amount" was equivalent of approximately 3% of the Net Sales for each contract year.

47. Pursuant to paragraph 12 of the Sublicense Agreement, Trek is subject to minimum sales requirements and if not met, subject to termination by LeMond Cycling upon 180 days notice.

48. During the course of its contractual relationship with LeMond Cycling and LeMond, Trek has at all times complied with all obligations under the Sublicense

Agreement, including its obligation to "use its best efforts to exploit the Mark in respect of Licensed Products [bicycles and bicycle frames bearing the LeMond trademark], and to promote the sale of Licensed Products in the Territory so as to try to maximize sales, consistent with the quality and reputation of Licensor [LeMond Cycling], and only to retailers (and distributors who sell to retailers) which properly reflect the image and reputation of Licensor and LEMOND [Greg LeMond]." In compliance with this obligation Trek, among other things:

(a) Consistently invested significant sums on marketing, promotion, and advertisement of LeMond bicycles and bicycle frames;

(b) Created an entirely new and revamped LeMond product line for the 2006 model year;

(c) Designed and launched the 2007 LeMond Tete de Course, which was the lightest production bicycle frame in the industry;

(d) Conducted marketing campaigns for the LeMond line, including a dealer showcase in Wisconsin (for which Trek flew in more than 100 top dealers, and at which John Burke personally and extensively praised Greg LeMond's many accomplishments), and a media showcase in California (for which Trek flew in the major bicycle media representatives to view, ride and review LeMond bicycles);

(e) Sold, marketed and advertised the LeMond bicycles and frames through high quality bicycle retailers, distributors and dealers.

49. Trek has used the contractually required best efforts notwithstanding LeMond's harmful self-dealing and disparaging statements that damaged Trek.

50. LeMond disputes that Trek has used the contractually required best efforts and has sought and will seek payment of money from Trek due to Trek's alleged failure to comply with the best efforts clause. Thus, an actual controversy exists pursuant to 28 U.S.C. § 2201 as to whether Trek has complied with its contractual best efforts requirement.

51. Trek seeks a declaration that it has fully complied with the "best efforts" clause of the Sublicense Agreement.

52. Alternatively, Trek seeks a declaration that the "best efforts" clause is indefinite and unenforceable.

## SECOND CLAIM FOR RELIEF
**Declaratory Relief—Trek's Right to Terminate**

53. All prior paragraphs are incorporated by reference.

54. Pursuant to paragraph 13.02.01 of the Sublicense Agreement, Trek is entitled to terminate the Sublicense agreement because LeMond Cycling and/or Greg LeMond took action which "damage[d] or ha[d] an adverse impact" on the trademarks LeMond Cycling licensed to Trek, and also on Trek, Trek's business, and Trek's goodwill.

55. Pursuant to paragraph 13.02.03 of the Sublicense Agreement, Trek is entitled to terminate the Sublicense Agreement because LeMond Cycling and or Greg LeMond took action which breached "material provision[s] of the [Sublicense] Agreement" and has failed to cure those breaches.

56. LeMond Cycling disputes that Trek is entitled to terminate the Sublicense agreement and disputes that LeMond Cycling and/or Greg LeMond's actions have breached the License Agreement or damaged or had an adverse impact on the trademarks LeMond Cycling licensed to Trek, or on Trek, Trek's business, or Trek's goodwill. Thus,

an actual controversy exists pursuant to 28 U.S.C § 2201 regarding Trek's entitlement to terminate the Sublicense Agreement.

57. Due to Greg LeMond's actions, Trek seeks a declaration that it is entitled to terminate the Sublicense Agreement, discontinue using the trademarks, and discontinue paying royalties to LeMond Cycling.

58. In addition, Paragraph 16.03 entitled "Certain Conditions" requires LeMond Cycling to "cause [Greg LeMond] to render his services hereunder in a professional and conscientious manner." Pursuant to paragraph 2.02, Greg LeMond's services include "promotion" of the LeMond bicycles and frames.

59. As a result of the conduct described above, including but not limited to the improper purchases and resales, bartering for value or other distribution of bicycles undermining Trek's dealers and the Trek-dealer relationship, the disparaging public statements directed at Lance Armstrong and other athletes, and the repeated threats to harm the LeMond brand and Trek, LeMond Cycling has not met the condition of rendering Greg LeMond's services in a "professional and conscientious manner."

60. Trek further seeks a declaration that LeMond Cycling's failure constitutes a nonoccurrence of a condition and given all the damage that has been done to Trek and the LeMond brand, it is too late for the condition to occur, and therefore, it may treat its duty as discharged and the contract as terminated.

WHEREFORE, Trek Bicycle Corporation seeks the following relief:

1. A declaration, pursuant to 28 U.S.C. § 2201, that Trek has complied with the "best efforts" provision of the Sublicense Agreement with LeMond Cycling or,

alternatively, a declaration that the "best efforts" provision is indefinite and therefore unenforceable; and

2. A declaration, pursuant to 28 U.S.C. § 2201, that LeMond has breached the Sublicense Agreement and that Trek is entitled to terminate its Sublicense Agreement with LeMond Cycling; and

3. A declaration, pursuant to 28 U.S.C. § 2201, that LeMond Cycling failed to comply with the "condition" set forth in the Sublicense Agreement that it "cause [Greg LeMond] to render his services hereunder in a professional and conscientious manner" thereby entitling Trek to suspend performance or discharging Trek from performing the "best efforts" obligation; and

4. Costs and attorney's fees pursuant to the License Agreement and applicable law; and

5. All other relief as the Court deems just and appropriate.

TREK DEMANDS A TRIAL BY JURY

Dated this 8th day of April 2008.

> s/ Ralph A. Weber
> Ralph A. Weber SBN 1001563
> Christopher P. Dombrowicki SBN 1041764
> Attorneys for Plaintiff Trek Bicycle Corporation
> Gass Weber Mullins LLC
> 309 North Water Street
> Milwaukee, WI 53202
> 414-223-3300 Telephone
> 414-224-6116 Facsimile
> weber@gasswebermullins.com
> dombrowicki@gasswebermullins.com